# MISSOURI *v.* NEBRASKA.
# NEBRASKA *v.* MISSOURI.

## IN THE SUPREME COURT OF THE UNITED STATES.

No. 5, Original. Submitted November 28, 1904,—Decided December 19, 1904.

Accretion is the gradual accumulation by alluvial formation and where a boundary river changes its course gradually the parties on either side hold by the same boundary—the center of the channel. Avulsion is the sudden and rapid change in the course and channel of a boundary river. It does not work any change in the boundary, which remains as it was in the center of the old channel although no water may be flowing therein. These principles apply alike whether the rivers be boundaries between private property or between States and Nations.

The boundary line between Missouri and Nebraska in the vicinity of Island Precinct is the center line of the original channel of the Missouri River as it was before the avulsion of 1867 and not the center line of the channel since that time, although no water is now flowing through the original channel.

Nothing in the acts of 1820 and 1836 relating to Missouri or the act admitting Nebraska into the Union indicates an intent on the part of Congress to alter the recognized rules of law fixing the rights of parties where a river changes its course by accretion or by avulsion.

THIS is a case of disputed boundary between two States of the Union.

The suit was commenced by an original bill filed in this court by the State of Missouri against the State of Nebraska. The relief sought by the former State is a decree declaring its right of possession of, and its jurisdiction and sovereignty over, certain territory east and north of the center of the main channel of the Missouri River as it runs between the two States at the present time; that Missouri be quieted in its title thereto; and that the State of Nebraska be forever enjoined and restrained from disturbing Missouri in the full enjoyment and possession of said territory.

The State of Nebraska, after answering, filed a cross bill

asking a decree confirming the possession, jurisdiction and sovereignty of Nebraska over said territory; that the boundary line between that part of Missouri known as Atchison County and that part of Nebraska known as Nemaha County, be ascertained and established, and permanent monuments erected to indicate the location of such line; and that the State of Missouri be enjoined and restrained from disturbing the State of Nebraska in the full enjoyment and possession of said territory.

The commissioners heretofore appointed to take the evidence have filed their report, and it is agreed that their finding of facts is correct. The case is before us upon questions of law arising out of the pleadings, the report of the commissioners, and the stipulation of the parties.

By an act of Congress of March 6, 1820, provision was made for the admission of Missouri into the Union with the following boundary: "Beginning in the middle of the Mississippi River, on the parallel of thirty-six degrees north latitude; thence west, along that parallel of latitude, to the St. Francois River; thence up, and following the course of that river, in the middle of the main channel thereof, to the parallel of latitude thirty-six degrees and thirty minutes; thence west along the same, to a point where the said parallel is intersected by a meridian line passing through the middle of the mouth of the Kansas River, where the same empties into the Missouri River, thence, from the point aforesaid north, along the said meridian line, to the intersection of the parallel of latitude which passes through the rapids of the river Des Moines, making the said line to correspond with the Indian boundary line; thence east, from the point of intersection last aforesaid, along the said parallel of latitude, to the middle of the channel of the main fork of the said river Des Moines; thence down and along the middle of the main channel of the said river Des Moines, to the mouth of the same, where it empties into the Mississippi River; thence, due east, to the middle of the main channel of the Mississippi River; thence down, and following the course

of the Mississippi River, in the middle of the main channel thereof, to the place of beginning: *Provided,* That said State shall ratify the boundaries aforesaid: (a) *And provided also,* That the said State shall have concurrent jurisdiction on the river Mississippi, and every other river bordering on the said State, so far as the said rivers shall form a common boundary to the said State, and any other State or States, now or hereafter to be formed and bounded by the same, such rivers to be common to both; and that the river Mississippi, and the navigable rivers and waters leading to the same, shall be common highways, and forever free, as well to the inhabitants of the said State as to other citizens of the United States, without any tax, duty, impost, or toll, therefor, imposed by the said State." 3 Stat. 545.

On January 15, 1831, the State of Missouri, speaking by its Legislature, memorialized Congress to make more certain and definite its northwest boundary. That memorial, among other things, stated: "When this State government was formed, the whole country on the west and north was one continued wilderness, inhabited by none but savages, and but little known to the people or to the Government of the United States. Its geography was unwritten, and none of our citizens possessed an accurate knowledge of its localities, except a few adventurous hunters and Indian traders. The western boundary of the State as indicated by the act of Congress of the sixth of March, eighteen hundred and twenty, and adopted by the Constitution of Missouri, is a 'meridian line passing through the middle of the mouth of the Kansas River, where the same empties into the Missouri River,' and extends from the parallel of latitude of 36 degrees and thirty minutes north, 'to the intersection of the parallel of latitude which passes through the rapids of the river Des Moines.' The part of this line which lies *north of the Missouri River* has never been surveyed and established, and consequently its precise position and extent are unknown. It is believed, however, that it extends about one hundred miles north from the Missouri

River, and almost parallel with the course of the stream, so as to leave *between the line and the river a narrow strip of land,* varying in breadth from fifteen to thirty miles. This small strip of land was acquired by the United States from the Kansas Indians, by the treaty of the third of June, eighteen hundred and twenty-five, and is now unappropriated and at the free disposal of the General Government. . . . These considerations seem to us sufficiently obvious to impress upon the public mind the necessity of interposing, whenever it is possible, some visible boundary and natural barrier between the Indians and the whites. The Missouri River, bending as it does, beyond our northern line, will afford the barrier against all the Indians on the southwest side of that river, by extending the north boundary of this State in a straight line westward, *until it strikes the Missouri, so as to include within this State the small district of country between that line and the river,* which we suppose is not more than sufficient to make two, or at most three, respectable counties. . . . In every view, then, we consider it expedient that the district of country in question should be annexed to and incorporated with the State of Missouri; and to that end we respectfully ask the consent of Congress. . . . With these views of the present condition and future importance of that little section of country, and seeing the impossibility of conveniently attaching it now or hereafter to any other State, your memorialists consider it highly desirable, and indeed necessary, that it should be annexed to and form a part of the State of Missouri. And to the accomplishment of that desirable end we respectfully request the assent of Congress."

A subsequent act, entitled "An act to extend the western boundary of the State of Missouri to the Missouri River," approved June 7, 1836, provided: "That when the Indian title to all the lands lying between the State of Missouri and the Missouri River shall be extinguished, the jurisdiction over said lands shall be hereby ceded to the State of Missouri, and the western boundary of said State shall be then extended *to* the

Missouri River, reserving to the United States the original right of soil in said lands, and of disposing of the same: *Provided,* That this act shall not take effect until the President shall by proclamation, declare that the Indian title to said lands has been extinguished; nor shall it take effect until the State of Missouri shall have assented to the provisions of this act." 5 Stat. 34.

It is alleged in the bill that Congress intended by the act of 1836 to meet the wishes of Missouri as expressed in its memorial; that after the passage of that act the President, by proclamation, declared that the Indian title to the lands covered by that act had been extinguished; and that Missouri duly assented to its provisions.

By an act of Congress approved February 9, 1867, Nebraska was admitted into the Union, with the following boundary: "Commencing at a point formed by the intersection of the western boundary of the State of Missouri with the fortieth degree north latitude; extending thence due west along said fortieth degree north latitude to a point formed by its intersection with the twenty-fifth degree of longitude west from Washington; thence north along said twenty-fifth degree of longitude to a point formed by its intersection with the forty-first degree of north latitude; thence west along said forty-first degree of north latitude to a point formed by its intersection with the twenty-seventh degree of longitude west from Washington; thence north along said twenty-seventh degree of west longitude to a point formed by its intersection with the forty-third degree north latitude; thence east along said forty-third degree of north latitude to the Reya Paha River; thence down the middle of the channel of said river, with its meanderings, to its junction with the Niobrara River; thence down the middle of the channel of said Niobrara River, and following the meanderings thereof, to its junction with the Missouri River; thence down *the middle of the channel* of said Missouri River, and following the meanderings thereof, to the place of beginning."   14 Stat. 391; 13 Stat. 47.

*Mr. Edward C. Crow,* Attorney General of the State of
Missouri, and *Mr. Sam B. Jefferies,* for the State of Missouri:

The only question here involved—that the central channel
of Missouri River wherever it may at any time run is the
boundary line between Missouri and Nebraska—is one of law.
The contention of Missouri is that the central thread of the
middle channel of the Missouri River is the dividing line be-
tween the States in question, and that this central thread
constitutes at all times the proper line of division regardless
of where it may run or be located.

The act of Congress, annexing Platte's Purchase to the
jurisdiction of Missouri, construed in a practical way and in
conformity with the legislative memorial of Missouri, ap-
proved June 15, 1831, unquestionably fixes the Missouri River
as the boundary and brands it as the perpetual and natural
monument without further description or further evidence.

There can be no question but that the Missouri River was
designated as a natural monument by both the act of annexa-
tion and the memorial requesting the same. Being a natural
monument, it must stand as ordained, for natural monuments
are objects permanent in character, if they are found upon
land as they were placed by nature, such as streams, lakes
and ponds. 3 Washburn's Real Property, 5th ed., 435; Tiede-
man on Real Property, 2d ed., § 831.

Where a river is made the boundary between jurisdictions,
the middle of the river is considered the point or line of de-
markation, or, in other words, the term "river" when used to
designate a boundary between two jurisdictions, means, in
law, the middle of the river. *Stanford* v. *Manin,* 30 Georgia,
355; *Hicks* v. *Coleman,* 85 Am. Dec. 103; *Lowell* v. *Robinson,*
33 Am. Dec. 673; *Hardin* v. *Jordan,* 140 U. S. 380.

It is not the meander line formed by what may be termed
the water's margin, but the waters themselves which constitute
the real boundary. *Railroad Co.* v. *Schurmer,* 7 Wall. 272;
*Jeffries* v. *East Omaha Land Co.,* 134 U. S. 178; *Houck* v. *Yates,*
82 Illinois, 179; *Fuller* v. *Dauphin,* 124 Illinois, 542; *St. Louis*

*Bridge Co.* v. *People ex rel.*, 125 Illinois, 228; *Butterworth* v. *St. Louis Bridge Co.*, 123 Illinois, 535.

It has been said that a river is composed of the bed, banks and stream. *Eastman* v. *Water Company*, 43 Minnesota, 60. This, however, is not an exact statement of the true meaning of the term. A more apt way of putting it is that a river is composed of a stream of constantly and continuously flowing water, through a natural drainage basin, with the bed and banks as essential incidents to it. It is not the bed and banks which constitute the river, but the natural stream of water. When observed from the standpoint of the reason upon which the legislature of Missouri memorialized Congress to annex Platte's Purchase to Missouri and the act of Congress annexing the same, no other conclusion can be reached but that it was intended to make the stream the boundary line wherever that stream might at any time run.

The channel is the passageway between the banks through which the water of the stream flows. *Benjamin* v. *River Improvement Company*, 42 Michigan, 628.

The term "natural channel" includes not only all channels through which in the existing conditions of the country water naturally flows, but new channels through which it might afterwards flow. *Larrabe* v. *Cloverdale*, 131 California, 96.

The rule is settled that meander lines are not intended as boundaries, but that the body of the water will be regarded as the true boundary. *Jeffries* v. *East Omaha Land Co.*, 134 U. S. 178; *Mitchell* v. *Smith*, 140 U. S. 406; *Hardin* v. *Jordan*, 140 U. S. 371; *Clute* v. *Fisher*, 65 Michigan, 48; *Norwood* v. *Smith*, 59 Wisconsin, 344. This notwithstanding that in certain instances if a boundary river leaves its old channel and forms a new one, within the limits of either of the States which border on it, the old channel will remain the boundary. *Indiana* v. *Kentucky*, 136 U. S. 479; *Missouri* v. *Kentucky*, 11 Wall. 395; *Nebraska* v. *Iowa*, 143 U. S. 359, however, do not control as different principles and facts are involved. In this case

that territory known as Platte's Purchase, was annexed to Missouri by reason of a memorial coming from its legislative department in 1831, wherein certain important and substantial reasons were set out why the Missouri River, north of the mouth of the Kaw, should be fixed forever as an absolute boundary of Missouri. Soon afterwards this territory was annexed to the jurisdiction of the State. Congress had undoubted authority to annex the territory in the manner herein described. There can be no question but that it was the intention of the legislature of Missouri to make the request in the manner herein presented, because it was so shown clearly from the resolution.

As the annexation statute construed in the light of the memorial, shows the plain intention of Congress was to make the Missouri River wherever it might run the absolute boundary of the State, it matters not whether those conditions still exist which were considered in the memorial, and which authorized, warranted and induced Congress to so ordain. The conditions which moved Congress to enact the statute may have passed away. That, however, does not deprive the State of Missouri of the right to demand a strict compliance with the original grant as it was intended when made.

Missouri was admitted into the Union in 1820, long prior to the admission of Nebraska and during a time when all the territory immediately west of the Missouri River belonged to the Federal Government. At the time of its admission there was no practical assurance that the territory now known as Nebraska would ever be admitted into the Union. It belonged to the Federal Government to be disposed of at will, to be held as a territory or afterwards subdivided and admitted into the Union as a State.

By accepting the terms of the memorial annexing Platte's Purchase to the State of Missouri, the Federal Government made an absolute guarantee to the people of Missouri that the stream of water flowing from the Rockies, known as the Missouri River, should forever be its absolute boundary line.

Construed in the light of the memorial and according to the plain words of the statute of annexation, Missouri now claims that fixed and vested rights were obtained thereunder, and that she is entitled to complete jurisdiction and sovereignty over all the territory lying east of the Missouri River as hereinbefore stated, and that it was more important at the time of the annexation that this river be made the absolute boundary for all time to come than to afterward have such boundary changed by reason of sudden variation in the channel of the river. Indeed, had the fact in question been raised long prior to the admission of Nebraska into the Union, and after the annexation statute had been approved, no one would have questioned the right of Missouri to claim and obtain absolute sovereignty over the territory here involved. This principle is made manifest by reason of the terms of the statute construed in the light of the memorial and it fixes a vested privilege and right in the State of Missouri regardless of what might afterwards have been done by the Federal Congress without the consent of this complainant.

The rights and duties with respect to waters depends primarily upon the relations which the opposing parties bear towards each other. Farnham on Waters and Water Rights, 3.

In this controversy, there is no agreement or contractual relations existing between the State of Nebraska and the State of Missouri, so far as the boundary line between the two States is concerned. Both States derive their power and rights in the premises from the Federal Government and Missouri, prior to the admission of Nebraska, being granted and delegated with sovereignty and power over the territory known as Platte's Purchase, and the Missouri River being at the time fixed as the absolute boundary line, is asking that the terms of the grant annexing the northwestern territory to it be strictly carried out. Congress unquestionably had authority to fix the Missouri River as it then and as it might subsequently run as the western boundary. When Nebraska was admitted into the Union, it came with both actual and constructive notice

that its jurisdiction could never extend to the east of the Missouri River south of the boundary line between Iowa and Missouri.

*Mr. Frank N. Prout,* Attorney General of the State of Nebraska, and *Mr. W. H. Kelligar,* for the State of Nebraska:

Where the course of a river forming the boundary between States is suddenly changed by avulsion, the boundary remains unchanged. The findings of the commissioners and the evidence adduced before them show that the Missouri River between Missouri and Nebraska changed its course in a single day—July 5, 1867—and left a large area of Nebraska land on the east side. This fact and the correctness of the findings of the commissioners are also established by stipulations of the parties.

The change having taken place in a single day, it is perfectly clear that no law applicable to accretion could have operated to transfer the territory in controversy from Nebraska to Missouri. The jurisdiction of those States and the status of the citizens do not fluctuate with every freak of the Missouri River. If they did, a large portion of the Nebraska population might go to bed at night in Nebraska and get up in the morning on the same spot in Missouri.

The rule applicable to the facts presented by the record has been stated by this court, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. *Iowa* v. *Nebraska,* 143 U. S. 361.

The boundary line between States does not change with a change in the channel of a river which had been the boundary. *Missouri* v. *Kentucky,* 11 Wall. 401; *Holbrook* v. *Moore,* 4 Nebraska, 437; *Collins* v. *State,* 3 Tex. Cr. App. 325; *Willey* v. *Lewis,* 28 Wkly. L. B. 104; Act of 1836, 5 Stat. 34.

The act of 1836, 5 Stat. 34, merely extends the boundary

of the State of Missouri to the Missouri River upon extinguishment of the Indian title to the intervening land, and does not purport to change the rule of law that where the course of a river forming a boundary is suddenly changed by avulsion, the boundary remains unchanged. The act furnishes no foundation for complainant's argument that the shifting channel of the Missouri River, wherever it may be, whether changed by accretion or avulsion, is the eternal boundary line between Missouri and Nebraska. If the Missouri River should suddenly cut across the west end of Nebraska, complainant's theory would wipe Nebraska off the map and leave Missouri in possession of a vast empire acquired without regard to the rights of the inhabitants. No such conclusion is deducible from the enactment quoted.

But the argument of complainant seems to be that the act of Congress derived some additional significance from the legislative memorial of Missouri, in pursuance of which the statute was enacted. The memorial amounts to nothing more than an argument in favor of the passage of the act. The intention of Congress is clearly expressed in the enactment and there is no occasion to resort to the memorial, either to ascertain the legislative will or to give effect to the statute.

Had Nebraska never been admitted into the Union, the State of Missouri would not now have jurisdiction of a crime committed on the land in dispute known as Island Precinct.

It is a rule of the courts, both state and Federal, that where the course of a river forming the boundary between States is suddenly changed by avulsion, the boundary remains unchanged.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

It is undisputed in the case that *prior* to July 5, 1867, the bed and channel of the Missouri River were substantially as they had been continuously from the date of the admission of

the respective States into the Union, only such variations occurring during that entire period as naturally followed in the course of time from one side of the river to the other.   But on the day just named, July 5, 1867 (which was after the admission of Nebraska into the Union), within twenty-four hours and during a time of very high water, the river, which had for years passed around what is called McKissick's Island, cut a new channel across and through the narrow neck of land at the west end of Island Precinct (of which McKissick's Island formed a part), about a half mile wide, making for itself a new channel and passing through what was admittedly, at that time, territory of Nebraska.   After that change the river ceased to run around McKissick's Island.   In the course of a few years, after the new channel was thus made, the old channel dried up and became tillable land, valuable for agricultural purposes, whereby the old bed of the river was vacated about fifteen miles in length.   This change in the bed or channel of the river became fixed and permanent; for, at the commencement of this suit it was the same as it was immediately after the change that occurred on the fifth day of July, 1867.   The result was that the land between the channel of the river as it was prior to July 5, 1867, and the channel as it was after that date and·is now, was thrown on the east side of the Missouri River; whereas, prior to that date it had been on the west side.

The fundamental question in the case is, whether the sudden and permanent change in the course and channel of the river occurring on the fifth day of July, 1867, worked a change in the boundary line between the two States.

The former decisions of this court relating to boundary lines between States seem to make this case easy of solution.

In *New Orleans* v. *United States*, 10 Pet. 662, 717, argued elaborately by eminent lawyers, Mr. Webster among the number, this court said: "The question is well settled at common law, that the person whose land is bounded by a stream of water, which changes its course gradually by alluvial forma-

tions, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss, by the same means which may add to his territory; and as he is without remedy for his loss, in this way, he cannot be held accountable for his gain." It was added—what is pertinent to the present case—that "this rule is no less just when applied to public, than to private rights." The subject was under consideration in *Missouri* v. *Kentucky,* 11 Wall. 395, and *Indiana* v. *Kentucky,* 136 U. S. 479. But it again came under consideration in *Nebraska* v. *Iowa,* 143 U. S. 359, 361, 367, 370. In the latter case, the court, after referring to the rule announced in *New Orleans* v. *United States,* and citing prior cases in which that rule had been recognized, said: "It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion. In Gould on Waters, sec. 159, it is said: 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates.' 2 Bl. Com. 262; Angell on Water Courses, § 60; *Trustees of Hopkins' Academy* v. *Dickinson,* 9 Cush. 544; *Buttenuth* v. *St. Louis Bridge Co.,* 123 Illinois, 535; *Hagan* v. *Campbell,* 8 Porter (Ala.), 9; *Murry* v. *Sermon,* 1 Hawks (N. C.), 56.

"These propositions, which are universally recognized as correct where the boundaries of private property touch on streams, are in like manner recognized where the boundaries between States or nations are, by prescription or treaty, found in running water. Accretion, no matter to which side it adds ground, leaves the boundary still the center of the channel. Avulsion has no effect on boundary, but leaves it in the center

of the old channel." Again, in the same case, the court, referring to the very full examination of the authorities to be found in one of the opinions of Attorney General Cushing (8 Op. Atty. Gen'l, 175), said: "The result of these authorities puts it beyond doubt that accretion on an ordinary river would leave the boundary between two States the varying center of the channel, and that avulsion would establish a fixed boundary, to wit, the center of the abandoned channel. It is contended, however, that the doctrine of accretion has no application to the Missouri River, on account of the rapid and great changes constantly going on in respect to its banks; but the contrary has already been decided by this court in *Jeffries* v. *Land Company*, 134 U. S. 178, 189." In *Nebraska* v. *Iowa*, it appeared that the Missouri River near the land there in dispute had pursued a course in the nature of an ox-bow, but it suddenly cut through the neck of the bow and made for itself a new channel. The court said: "This does not come within the law of accretion, but that of avulsion. By this selection of a new channel the boundary was not changed, and it remained as it was prior to the avulsion, the center line of the old channel; and that, unless the waters of the river returned to their former bed, became a fixed and unvarying boundary, no matter what might be the changes of the river in its new channel."

Manifestly, these observations cover the present case and make it clear that the boundary line between Missouri and Nebraska in the vicinity of Island Precinct cannot be taken to be the middle of the channel of the Missouri River, as it has been since the avulsion of 1867 and now is, but must be taken to be the middle of the channel of the river as it was prior to such avulsion. We cannot see that there are any facts or circumstances that withdraw the present case from the rule established in former adjudications.

Counsel for Missouri contend that the act admitting Missouri into the Union, the memorial sent by the Legislature of that State to Congress in 1831, and the act of June 7, 1836, with the

proclamation of the President as to the extinguishment of Indian titles to lands between Missouri, as originally bounded, and the Missouri River, show that Congress intended that, so far as the boundary of the State of Missouri was concerned, the middle of the channel of the Missouri River, wherever it may be at any particular time—and regardless of any changes, however caused or however extended, or permanent, suddenly occurring in its course or channel—was to be taken as a perpetual, natural monument fixing the boundary line. We cannot accept this view. We perceive no reason to believe that Congress intended, either by the acts of 1820 and 1836 relating to Missouri or the act admitting Nebraska into the Union, to alter the recognized rules of law which fix the rights of parties where a river changes its course by gradual, insensible accretions, or the rules that obtain in cases where, by what is called avulsion, the course of a river is materially and permanently changed. Missouri does not dispute the fact that when Nebraska was admitted into the Union the body of land described in the present record as Island Precinct was in Nebraska. It is equally clear that those lands did not cease to be within the limits of Nebraska by reason of the avulsion of July 5, 1867.

For the reason stated we adjudge, in respect of the matters involved in this suit, that the middle of the channel of the Missouri River, according to its course as it was prior to the avulsion of July 5, 1867, is the true boundary line between Missouri and Nebraska. Accordingly, the original bill must be dismissed, and a decree entered in favor of the State of Nebraska on its cross bill.

It appears from the record that about the year 1895 the county surveyors of Nemaha County, Nebraska, and Atchison County, Missouri, made surveys of the abandoned bed of the Missouri River, in the locality here in question, ascertained the location of the original banks of the river on either side, and to some extent marked the middle of the old channel. If the two States agree upon these surveys and locations as correctly

marking the original banks of the river and the middle of the old channel, the court will, by decree, give effect to that agreement; or, if either State desires a new survey the court will order one to be made and cause monuments to be placed so as to permanently mark the boundary line between the two States. The disposition of the case by final decree is postponed for forty days, in order that the court may be advised as to the wishes of the parties in respect of these details.