NICOLAI, Respondent, vs. WISCONSIN POWER & LIGHT COMPANY, imp., Appellant.

*January 14—February 15, 1938.*

84

For the appellant there was a brief by *Schubring, Ryan, Petersen & Sutherland* of Madison, and oral argument by *Robert J. Sutherland.*

For the respondent there was a brief by *Donovan, Gleiss & Goodman* of Sparta, and oral argument by *L. J. Goodman.*

MARTIN, J.   A road, known as County Trunk T, runs in a northerly and southerly direction, past the William Hubbard farm, in the township of Sheldon, Monroe county.   On and prior to October 3, 1933, a telephone line, which carried telephone wires of both the Norwalk Telephone Company and the Monroe County Telephone Company, ran parallel with and along the west side of said road, past the Hubbard farm, to a point fifty to sixty rods south of the Hubbard farm buildings, and there crossed to the east side of the road. At the place of crossing, there was a high knoll on the west side of the road and a high bank on the east side, giving greater height across the road.   From this point of crossing, the telephone-pole line extended to the south, along the east side of the road.   The high-voltage line (6,600 volts) of the

appellant Wisconsin Power & Light Company was located on the east side of the road, and consisted of three parallel wires on a six-foot crossarm. The high-voltage line extended north and south, parallel with the road and through a cornfield, adjacent to and on the east side of said road. At the east end of the telephone-wire span crossing the road, the wires were supported by a telephone pole, located on the edge of a steep bank immediately adjacent to the cornfield, and separating the cornfield from the east ditch along the road. At this point, appellant's high-voltage line extended on to the south, through the cornfield, parallel with the road, at such a distance from the telephone pole that the west wire of appellant's line was twelve feet east from the telephone pole. This point was about in the center of a one hundred sixty-seven-foot span of the high-voltage line, both ends of such span being supported by poles located in the cornfield. The cornfield, between and in the vicinity of these Wisconsin Power & Light Company poles, ended on the west in a steep drop off of four to six feet from the field into the ditch along the east side of the road. There was no fence on the east side of the road. Both the telephone and power lines had existed in this position for a number of years. The road existed for a long period, had been maintained by the county and used by the public. It consisted of a gravel and dirt portion, twenty to twenty-two feet in width, with a grass-filled ditch on either side. No proof was made of any description, or survey, dedication, or legal limits of the road.

Shortly prior to October 3, 1933, the county highway committee notified the telephone companies of its intention to grade the road, and had notified the telephone companies to move the pole line further east on the east side of the road, to permit of some widening incident to the grading. The highway committee had stakes set out indicating to what point grading was intended. The highway commissioner

had not examined any records as to the width or legal location of the road. On the morning of October 3, 1933, a joint crew, consisting of the employees of both telephone companies, under the supervision of the foreman of the Monroe County Telephone Company, went to the vicinity in question to move the telephone-pole line. The deceased was a member of this joint crew. They were at work moving the east telephone pole of the telephone span crossing the road, when the accident occurred. The east telephone pole, the one involved in this accident, was located right on the edge of the east bank. The line of stakes, set out by the highway committee, were located about a foot to the east of this pole. The telephone pole was guyed to the east by a guy wire fastened in the field several feet from the edge of the bank.

The wire had been removed from the telephone pole; a new hole had been dug directly east from the pole. This hole was in the cultivated field and directly underneath the west wire of the appellant's high-tension line. The telephone crew had lifted the pole out of the old hole, moved it east, and had set it into the new hole. It appears that a member of the telephone crew climbed up the pole and reported that there was only a foot to eighteen inches of clearance between the top of the telephone pole and the west wire of the high-voltage line. The foreman of the crew ordered the pole moved to another location. At the time members of the crew were about to lift the pole out of the hole, the foreman said:

"Now look out for that stuff above you, it is nothing to play with. It is pretty hot."

The crew knew the power line was a hot line. It appears that two members of the crew took hold of the pole at the bottom with carrying hooks to lift it up. At this time Mr. Nicolai stood about three feet east of the pole, holding the guy wire. The telephone pole was twenty feet long. The

clearance between the high-voltage line and the ground, at that point, was seventeen feet one inch. The guy wire was wound around the top of the pole, like a figure eight, the top loop being two feet from the top of the pole and the bottom loop being six inches lower. When the pole had been lifted so that it was just out of the hole, Mr. Nicolai fell to the ground electrocuted.

Order No. 1,232 of the State Electric Code, adopted by the industrial commission, with reference to clearance required by high-voltage lines, is, in part, as follows: The clearance required where wires cross over spaces or ways accessible to pedestrians only is set at fifteen feet; the clearance required where "wires run along roads in rural districts" is set at eighteen feet. These provisions are for spans one hundred fifty feet in length; for spans exceeding one hundred fifty feet, the code provides that the clearance be increased by one tenth of a foot for each ten feet of the excess over one hundred fifty feet.

Appellant contends that the court should have granted its motion for a directed verdict or granted judgment notwithstanding the verdict. Appellant claims that the provision of the electric code, requiring a vertical clearance of eighteen feet of wires above ground, where the wires run along roads in rural districts, does not apply in the instant case; hence there is no violation of the code and no actionable negligence. If the eighteen-foot clearance is applicable, there was a violation of the code. If the fifteen-foot clearance is applicable, there was no violation because the actual clearance, at the point of the accident, was seventeen feet one inch. The respondent contends that the eighteen-foot clearance is applicable. These contentions involve the location of the high-voltage wires with reference to the limits or edges of the road; also, the meaning of the words, "along a road." A general description of the road was quite fully given in the

foregoing statement of facts. It is conceded that it is a road by user. It further appears without dispute that it is between twenty and twenty-two feet wide, with drainage ditch on the east side, estimated at from six to ten feet in width. It further appears without dispute that at the point in the highway, immediately opposite the place where the accident occurred, there is a high knoll along the west side of the road, also a high bank along the east side. The width or limits of a highway by user are determined by the limits of the user. *Stricker v. Reedsburg,* 101 Wis. 457, 77 N. W. 897; *Neale v. State,* 138 Wis. 484, 120 N. W. 345. However, this does not mean that the traveled track necessarily determines the limits of the user. It includes such portion as goes with the traveled track for the purposes of the highway. See *Konkel v. Pella,* 122 Wis. 143, 147, 99 N. W. 453; *Bartlett v. Beardmore,* 77 Wis. 356, 46 N. W. 494.

In *Stricker v. Reedsburg, supra,* the road was one by user and was, at the place of the accident, twenty-six feet in width, between a clump of trees on the west and a stump referred to on the east. The whole twenty-six feet was in good condition for travel at the time of the accident. There was a temporary track used, east of the stump. The jury found that this temporary track had only existed a few months at the time of the accident. The court held the track was outside of the limits of the highway; that the highway consisted simply of the space between the trees on the west and the stump on the east, and no more, because a highway by user extends no further than the use which has created it. Referring to the accident, the court said (p. 462) :

"But it [stump] can only be a defect as to one who is lawfully using the prepared way and exercising ordinary care. If one is not using the way, but is voluntarily deviating therefrom upon adjoining lands, and runs into such an obstruction while returning to the way, he cannot recover.

That is just what the evidence shows that the intestate's husband was doing in the present case. He had voluntarily driven his team *out of the limits of the highway,* upon the temporary track to the east, when no necessity existed for such deviation, and when returning to the traveled track of the highway his wagon ran against the stump and the injuries complained of were suffered. In such a case there can be no recovery."

So, in the instant case. The road was about twenty feet in width, with a ditch on the east side, estimated at six to ten feet in width. Along the west side there was a high knoll, and on the east side there was a bank about six feet high. It is obvious that the user by the public was, at all times prior to the accident, confined within the boundary of the knoll on the west side and the high embankment of the east side.

The respondent contends that County Trunk T is also a highway by dedication and, as such, is four rods wide. There is no evidence to sustain this contention; it being a highway by user, there is no presumption as to its width. It appears without dispute that Mr. Hubbard cultivated his field, located on the east side of the road, right up to the edge of the high embankment. The high-voltage line of appellant company, according to actual measurement, was in a distance of twelve feet, in Mr. Hubbard's cultivated field. Upon the uncontradicted evidence, we must hold that appellant's high-voltage line was not within the limits of the highway.

Respondent makes the further contention that, regardless of whether or not the high-voltage line was within the limits of the highway, it did run along said road in a rural district, and therefore Order No. 1,232 of the State Electric Code applies. This cannot be sustained. The road, of course, ran through a rural district. The question is, Do the high-voltage wires run along a road in a rural district? A supplement to the State Electric Code was adopted some time after the

accident in question. This supplement states, referring to Order No. 1,232, Table No. 1, of the original code, that:

"The references to streets, alleys, and roads in urban or rural districts relates to conductors within the limits of the highways or other public rights of way for travel."

This provision is interpretative of the provision requiring a clearance of eighteen feet where "wires run along roads in rural districts." The court will take judicial notice of the provision above quoted. *Wisconsin Truck Owners Asso. v. Public Service Comm.* 207 Wis. 664, 677, 242 N. W. 668; *Wisconsin Power & Light Co. v. Beloit,* 215 Wis. 439, 444, 254 N. W. 119. The word "along" is used as a preposition, and as such is defined by Webster's International Dictionary as:

"By the length of; lengthwise of, implying motion or extension upon, or at or near, the side of, according to the context, distinguished from across; as, a grant of a privilege to construct a railroad along a street means upon it without reference to position at its middle or side, but a privilege to construct a road along a stream or body of water means at the side of it but not over it."

The word "along," where used in relation to fences relative to railroads along streets through cities, means "along and adjoining" the street edge. *Atlantic City R. Co. v. City of Pleasantville,* 99 N. J. Law, 328, 124 Atl. 375. As used by statute relating to use of public streets by railways, it means "along in the street." *Arbenz v. Wheeling,* 33 W. Va. 1, 11 S. E. 14. Where used in connection with highways along streams, it means within reasonable distance of streams. *Stahr v. Carter,* 116 Iowa, 380, 90 N. W. 64. The word "along," used relative to posting notices along highways, means "by the side of or near." *Williams v. Board of Commissioners of Routt County,* 37 Colo. 55, 84 Pac. 1109. The word "along," as used in the code, making

railroads liable for killing or maiming animals belonging to landowners through or along which the railroad runs, resulting from failure to maintain suitable fences, means "adjoining," and implies contact and, hence, the section did not give a right of action to an owner of land which was separated from the railroad company by a road. *Barbee v. Southern Pac. Co.* 9 Cal. App. 457, 99 Pac. 541.

The purpose of the provisions as to clearance, required by the electric code, is clear. It is for the safety of users of the highway. This purpose is accomplished if the lines within or on the line limit comply with the code. The interpretation of the industrial and public service commissions of the words "along roads" limits the application of the code to the limits of the highways or other right of ways for travel. If the provisions of the code under consideration apply to lines beyond the limits of the highway or beyond the immediate highway boundary, where will the application end? Upon the undisputed facts in the instant case, the appellant's wires, at the nearest point, were twelve feet east from the point where the telephone pole had been located. This being a highway by user, the telephone pole, as originally located near the edge of the embankment, on the east side of the highway, was beyond the east limits of the highway. The appellant's line was twelve feet further east in Mr. Hubbard's cultivated field.

Sec. 86.16 (1), (2), Stats. 1933, provides:

"(1) Any person, firm or corporation may, with the written consent of the town board, but subject to the approval of the state highway commission, construct and operate telegraph, telephone or electric lines for the purpose of transmitting messages, light or power along or within the limits of any highway.

"(2) All poles used in the construction of such lines shall be set in such manner as not to interfere with the use of such highway by the public nor with the use of the adjoining land by the owner thereof; and all wires shall be not less than

eighteen feet above the ground at all crossings, and not less than fourteen feet above the ground at all other places."

This same provision and section number are found in the Statutes of 1937.

Whether the clearance as provided in the statute or as specified in the electric code be applied in the instant case, it being conceded that there was a clearance of seventeen feet one inch, there was no violation of the statute or the electric code. Therefore, there is no liability, and appellant's motion for a directed verdict should have been granted.

In view of the conclusion reached, it is not necessary to consider other questions discussed in briefs of counsel.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the action.