LAGO of Pago Pago,
FUGA SELEGA of Pago Pago,
POGAI and FAAFIA, Objectors

v.

MAGEO of Pago Pago and
GOVERNMENT OF AMERICAN SAMOA, Intervenor

No. 25-1962

High Court of American Samoa

Civil Jurisdiction, Trial Division

[Land: "Fusi" in Pago Pago]

October 12, 1962

Leuluai, Counsel for Lago.
Laota, Counsel for Fuga Selega.
Teaolo, Counsel for Pogai and Faafia.
Ben Schirmer, Counsel for Mageo.
Owen S. Aspinall, Attorney General, Counsel for GAS.

### OPINION OF THE COURT

MORROW, *Chief Justice.*

Mageo filed his application with the Registrar of Titles to have land described as Fusi in Pago Pago registered as the communal family land of the Mageo Family. The application was accompanied by a survey of the land proposed to be registered.

Lago filed an objection to the proposed registration claiming that Fusi was the communal family land of the Vaivao Family of Pago Pago. Lago was a former holder of the Vaivao title. Fuga Selega likewise filed an objection to the proposed registration claiming that Fusi was the communal family land of the Fuga Family, and Pogai and Faafia also filed an objection claiming that Fusi was the communal family land of the Taito Family. The Government of American Samoa, acting by its Attorney General, filed a petition of intervention in which it was claimed that the title to Fusi was in the Government of American Samoa. We have a case, therefore, in which each of five different parties claims to own the same piece of land in its entirety.

Pogai and Faafia are members of the Taito Family. This family has no matai at the present time, its last matai having died some years ago. His successor in title has not yet been chosen.

At the hearing it appeared that Fusi is a tract of land lying at the headwaters of Pago Pago Bay. The paved

public highway running around the Bay cuts it in two. Only the part of Fusi lying on the seaside of the highway was included in the survey accompanying Mageo's application to register, and it is that part only that will be considered for registration.

Hereinafter by Fusi we mean that part of it lying seaward of the highway.

Prior to the hearing the Court viewed Fusi in the presence of all parties including the Attorney General representing the Government of American Samoa.

■ On September 3, 1900, Commander B. F. Tilley, then Commandant of the U.S. Naval Station, Tutuila, issued "An Ordinance Relating to a Public Highway in Pago Pago" by the terms of which land for a public highway from "Blunt's Point on the southern side of Pago Pago Harbor extending therefrom towards Observatory Point and around the Harbor to 'Breaker's Point' on the northern side of said Harbor, along the shore at high-water mark, of a uniform width of fifteen feet distant inland from said shore, and the area of land included in said description is hereby condemned and appropriated for public uses." This ordinance numbered 15 provided for compensation for the land taken by the Government, claims for compensation to be made within three months from September 3, 1900. On the same day (Sept. 3, 1900) the Commandant issued a "Regulation Concerning the Public Road of Pago Pago as Defined in Ordinance No. 15 of the United States Naval Station, Tutuila," reading as follows:

"1. It shall be unlawful for any person or persons to erect any fence, wharf, boat house, building or other structure whatsoever to seaward of the Public Highway or Road running along high-water mark of the Harbor of Pago Pago as described in Section I of the Ordinance relating to a Public Highway in Pago Pago being number 15 of 1900, without special permission from the Commandant of the United States Naval Station, Tutuila; which permission may or may not be granted upon application of any person

who must lay before Commandant a written application with plans of any wharf, building or other structure intended to be erected.

"2. Any wharf, fence, building or other structure erected in contravention of this regulation must be removed upon the order of the Commandant at the expense of the person erecting or causing to be erected the same.

"3. Any contravention of this regulation will be punished with a fine not exceeding two hundred dollars exclusive of all costs incurred in the removal of any buildings, wharves or other structures erected contrary to the provisions of this Regulation.

"4. This Regulation shall take effect from and after the date of its publication.

"Published and Exhibited at the Public Office of the Commandant on this third day of September in the year 1900 A.D.

> "B. F. TILLEY, Commander, U.S.N.
> Commandant United States Naval
> Station, Tutuila."

This regulation was numbered 15. Section 1291 of the Code of American Samoa, 1949, is derived from Ordinance No. 15 and Regulation No. 16.

It will be noted that by Ordinance 15 the road was to be "of a uniform width of fifteen feet" and it was to be "distant inland from" the shore. It will also be noted that the road was to run "along high-water mark of the Harbor of Pago Pago."

■ Black's Law Dictionary, 4th Ed., defines "along" as "Lengthwise of, implying motion at or near, distinguished from across." And the Supreme Court of Wisconsin in *Misolai v. Wisconsin Power & Light Co.*, 227 Wis. 83, 277 N.W. 674, 678, said that "Where used in connection with highways along streams, it (the word 'along') means within reasonable distance of streams."

In *Stahr v. Carter*, 116 Iowa 380, 90 N.W. 64, 65, the Supreme Court of Iowa in construing a statute which authorized the board of supervisors on its own motion to establish a highway along a stream, when it could avoid

bridging such stream, said, "The word 'along' has a somewhat elastic meaning, even when used in its most technical sense, 1 Cent. Dic. As used in this statute, it is evidently not to be construed as meaning on the immediate bank of a stream; for such a narrow view of the intent of the legislature would in the majority of cases deprive the statute of all validity and make it a dead and useless part of the law. It should be liberally construed, to carry out its clearly expressed purpose of avoiding expensive bridging; and it is evident that if a highway cannot be established close to the stream and avoid this difficulty, *it may be established within a reasonable distance thereof* (emphasis ours), if in the vicinity of the stream and still be within the spirit and intent of the statute. *Railroad Co. v. Mead*, 90 Pa. 454; *Pratt v. Railroad Co.*, 42 No. 505.

██ We think that "along high-water mark of the Harbor of Pago Pago" in Ordinance No. 15 meant and should be construed to mean within a reasonable distance from the high-water mark, and this particularly in view of the fact that the road was to be "distant inland from" the shore.

Webster's International Dictionary (2nd Ed.) defines "distant" as meaning "separated; having an intervening space; at a distance; away. Separated by an interval or by intervals of greater or less regularity." It is very clear that the road was not to adjoin the shore, but that there was to be land between the road and the shore.

It would be highly impractical to build a highway at an equal distance from the shore at all points. To do so would require the road to follow exactly the windings or curves of the shore. We have indicated that "along the high-water mark" in Ordinance No. 15 meant a reasonable distance from the shore. What would be a reasonable distance at one point might not be a reasonable distance at another point. While the width of the road was set at 15 feet in the

ordinance, doubtless the reason the distance "inland" was not prescribed was because it was realized that the distance would necessarily vary, just as events proved that it did.

What would be a reasonable distance from the high-water mark at any particular point would depend upon the surrounding circumstances at that point at the time the road should be constructed, which time was obviously around 60 years ago and just a short time after the Government was established following the raising of the U.S. Flag on Tutuila on April 17, 1900. Obviously if a little, flat peninsula extended out into the sea, the road would cut across the peninsula and the distance between the shore and the road would be greater at that point than it would be at a point where there was no peninsula. In other words, a reasonable distance would be greater at the peninsula than it would be at a point where there was no peninsula.

As stated before, the Court viewed Fusi in the presence of all parties shortly prior to the hearing. We saw the road beside Fusi and the surrounding area. We saw the present large stream running by Fusi on the southeast side. The evidence clearly established that not so very many years ago and long after the Government was established there was a second stream that crossed a part of Fusi. The average rainfall here in American Samoa is around 200 inches a year. When it rains hard, the present stream running down from the mountain into Pago Pago carries down rock, dirt, and debris which is deposited in the bay, and the second stream did the same. This rock, dirt, and debris when it struck the bay without current, other than tidal, was deposited by the two streams in the bay and Fusi naturally was increased in size somewhat by accretions. There was also evidence that parts of Fusi were swampy at one time. While it was claimed that the word "Fusi" in

Samoan has other meanings, the fact is that "Fusi" also means "swampy".

In the olden days before the present highway was constructed, there was a footpath by Fusi which people used in going from villages on the Fagatogo side of the bay to villages on the other side. On the northeast end of Fusi is the Poyer School building. While there was some conflict in the evidence, we believe that the weight of evidence is clearly to the effect that it was built by the military authorities during World War II upon filled-in land. It was used by the U.S. Marines as a mess hall during the war.

The above-mentioned footpath was by the beach, but when the tide was low people using it walked between the high-water mark and the low-water mark a part of the way; also at one point on the north there were logs so pedestrians could keep out of the water. This would indicate that the area was swampy.

The people of the Village of Pago Pago built a village road around the headwaters of Pago Pago Bay. This road was at a distance inland from the shore. The weight of evidence in our opinion clearly establishes that when the present highway was originally built after the promulgation of Ordinance 15 on September 3, 1900, it was built on the Pago Village road. And the weight of evidence is clearly to the effect that the present paved highway follows the original highway; i.e., that the present paved highway is where the original highway constructed in accordance with Ordinance No. 15 and Regulation 16 was located.

We think (and we are the judges of the fact as well as the law), in view of the evidence, that the original highway constructed by the Government adjoining Fusi, in view of the surrounding circumstances, was built within a reasonable distance of the high-water mark. The fact that it followed the village road indicates this.

In view of the meaning of the word "along" as used in Ordinance No. 15, we think that not only did the Government condemn the land on which the original highway was actually constructed but that it also condemned the part of Fusi between the highway and the sea. In other words, the Government became the owner of the land on which the original highway was constructed and, in addition, the land lying between the highway and the high-water mark along the shore.

■ We are confirmed in that view also by the fact that Regulation No. 16 (above quoted) made it "unlawful for any person or persons to erect any fence, wharf, boat house, building or other structure whatsoever to seaward of the public highway or road running along high-water mark of the Harbor of Pago Pago being Number 15 of 1900 without special permission from the Commandant of the United States Naval Station, Tutuila," and that "Any wharf, fence, building or other structure erected in contravention of this regulation must be removed upon the order of the Commandant at the expense of the person erecting or causing to be erected the same." While a person may lawfully erect a building on his own land, he cannot lawfully erect a building upon land of the Government without its permission.

■ Not only do we conclude that that part of Fusi that lay between the road and the high-water mark as it existed about 60 years ago when the road was built became the property of the Government of American Samoa as the result of the condemnation, as provided in Ordinance No. 15, but we also conclude that accretions to Fusi, caused by the stream at its southwest side and the stream that flowed across it for many years after the road was built and another stream slightly northwest of it, became the property of the Government of American Samoa.

■ The Government was a riparian owner and as such riparian owner it became entitled to the additions thereto by accretion.

"The rules of accretion, reliction, erosion, and avulsion as determining boundaries apply to public as well as to private property and rights. Thus, the government, if the owner of riparian land, is entitled to additions thereto by accretion the same as if the land were owned by an individual." 56 Am.Jur. 902.

This principle was approved by the Supreme Court of the United States in *Missouri v. Nebraska*, 195 U.S. 23, 49 L.Ed. 372, 25 S.Ct. 155 and *Shively v. Bowlby*, 152 U.S. 1, 38 L.Ed. 331, 14 S.Ct. 548.

The Poyer School building stands on the northeast end of Fusi. As before stated, it was originally a mess hall built during the war by the military authorities for the use of the Marines. The weight of evidence was clearly to the effect that all or almost all of the building is located on filled-in land which was a part of Pago Pago Bay below the high-water mark and over which the tide ebbed and flowed.

■ The filled-in part of Fusi is clearly not the property of the Mageo Family, the Fuga Family, the Vaivao Family, or the Taito Family. Whoever owned Fusi at the time of the cession of Tutuila and Aunu'u to the United States on April 17, 1900 owned only to the high-water mark. We have held many times that Samoans acquired title to their lands through first occupancy coupled with a claim of ownership, and that was true before the establishment of the Government in 1900.

In the condemnation proceedings in *In re Tafuna Airport, Claimants to Plots 6 and 7*, No. 16-1957 (H.C. of Am. S.), we said that:

"Samoans originally acquired title to their land through first occupancy coupled with a claim of ownership. *Soliai v. Lagafua*, No. 5-1949 (H.C. of Am. S.), *Faataliga v. Fano*, No. 80-1948

(H.C. of Am. S.). See 2 Blackstone 8; Maine's Ancient Law (3rd Am. Ed.) 238."

 Samoans ordinarily took possession of land by going out into the virgin bush, cutting down the trees, burning them, or letting them rot, and then putting in plantations and, of course, when they had cleared land from the bush and put in plantations they claimed it as their own. They did not clear below the high-water mark. Furthermore, a landowner owning land by a body of water in which the tide ebbs and flows, as it does in Pago Pago Bay, owns only to the high-water mark. 8 Am.Jur. 759.

The deed of cession of Tutuila, made in 1900 and accepted by the United States on February 20, 1929 as of April 10, 1900 (48 U.S.C. § 1661), did not operate to change the title to private property. After the cession the Samoans owed allegiance to the United States but they retained ownership of their private property. Referring to the cession of Florida to the United States by the King of Spain, Chief Justice Marshall said in *United States v. Perchman*, 32 U.S. 51, 7 Pet. 51, 8 L.Ed. 604, 617 that:

"It may not be unworthy to remark that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations which has become law would be violated; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated, and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other, and their rights of property remain undisturbed. If this be the modern rule even in cases of conquest, who can doubt its application to the case of an amicable cession of territory?"

 Since the Samoans who owned Fusi before the cession owned it afterward, it was necessary that the land for the highway, unless it could be acquired through private negotiation, be condemned as it was.

Having been condemned by the Government of American Samoa pursuant to Ordinance No. 15, title to Fusi then became vested in the Government of American Samoa. And title to Fusi (and we exclude the present filled-in part) together with the accretions thereto are still the property of the Government of American Samoa unless it has parted with its title, which it has not.

Now Mageo originally claimed that Fusi was Mageo land, but we understood from the evidence that the Mageo and Taito Families are connected and there was evidence that his final claim was that it was Mageo-Taito land. Fuga originally claimed that Fusi was Fuga property but his final claim was that it was Fuga-Taito property. Lago, formerly a holder of the Vaivao title, claimed that it was Vaivao land. The final claim of Pogai and Faafia was that it was Mageo-Taito land.

■ All of these claims are without foundation. Some people in some of the various claimants' families doubtless did have fales on Fusi and occupied parts of it for more than 20 years after the Government acquired title as a result of the condemnation in 1900. However, the statute of limitations does not run against the Government of American Samoa with respect to land.

"Unless it is expressly or by necessary implication provided otherwise by constitution or statute, statutes of limitation do not run against the sovereign or the government, either against a state or, according to the decisions, against the United States, and do not operate to bar suits involving public or governmental rights which are brought by, or on behalf of, the state or government in its sovereign or governmental capacity. This rule is based on considerations of public policy and accords with the maxim, Nullum tempus occurrit regi." 53 C.J.S. 940.

■ We think the rule announced here with respect to the United States and the states is applicable to the Government of American Samoa. The sovereignty here is the

299

sovereignty of the United States. The Government of American Samoa exists solely by the authority of the United States. American Samoa is an insular possession of the United States. A state in the United States has sovereign powers subject to certain limitations, but

"All territory within the jurisdiction of the United States not included in any state must, necessarily, be governed by or under the authority of Congress." 49 Am.Jur. 326.

The Government of American Samoa derives all of its powers from the United States. Tit. 48 U.S.C. § 1661.

The opinion of Mr. Justice Marlan in *Grafton v. United States*, 206 U.S. 333, is instructive on the point involved here.

There is nothing in the statute of limitations here to indicate expressly or by implication that it runs against the Government with respect to land. See Tit. 3, Code of Am. Samoa, 1961 Ed. Sec. 3.1101(4). It follows, therefore, that if there was occupancy of Fusi by the applicant Mageo or the three objectors, or any of them, for 20 years or more after the Government acquired title to it through condemnation in 1900 such occupancy could not operate to deprive the Government of its title through adverse possession. And there was no evidence introduced to show that the Government had voluntarily parted with its title to the applicant or to any of the objectors. We can only conclude then that Fusi (we do not include the filled-in part) continues to be the property of the Government of American Samoa.

In the case of *Teo and Ropati of Pago Pago v. Totoa of Pago Pago*, No. 5-1946 (H.C. of Am. S.) this Court ruled that certain land lying seaward of the highway (the same highway as in the principal case) but not extending all the way to the high-water mark of the bay was the property of the Government of American Samoa, the same having been condemned for public use as appeared by the Sec. 1225

(now 1291) of the Code. This land was at the headwaters of Pago Pago Bay as is the land involved in the present case.

■ We are satisfied that the filled-in part of Fusi is the property of the United States and not the Government of American Samoa. On the question of Federal or Territorial ownership, the editors of Corpus Juris Secundum say that

"The title to land under navigable waters *within the boundaries of a territory of the United States* (emphasis ours) is held, not by the territory, but by the United States in trust for the whole people and the future state or states that may be erected out of the territory, subject, however, to disposition by Congress; the control of such lands is in the secretary of the interior, subject to legislation by Congress." 65 C.J.S. 197.

A bill (H.R. 4660) which passed the House of Representatives on July 2, 1962 would convey, subject to certain limitations, filled-in land which was "formerly, permanently, or periodically covered by tidal waters" in Pago Pago harbor by the United States to the Government of American Samoa. The very fact of the existence of this bill is indicative of an opinion by the Solicitor of the Department of the Interior as well as the legal advisor to the Committee on Interior and Insular Affairs in the House of Representatives that filled-in lands around Pago Pago Harbor are United States property, not Government of American Samoa property.

■ This Court had a somewhat similar, but far from identical, question before it in the case of *Mulu et al. v. Taliutafa*, No. 17-1953 (H.C. of Am. Samoa) in which we decided that Lalopua, the small piece of land in Manua on which stood the faleula and which was owned by the king in his capacity as king and not as a private individual, became the property of the United States when the Manua

Islands were ceded to the United States by the Tuimanua and his chiefs in 1904.

The applicant and the objectors all testified that they filed war damage claims on Fusi and that the War Damage Claims Commission recognized their ownership of Fusi by recommending payment of the claims by the United States. The applicant and some of the objectors testified that they had fales on Fusi which they had to take off by order of the Provost Marshal when the war started. We believe from the evidence that there were some fales, the property of possibly two of the parties in this case, which were destroyed upon orders of the Provost Marshal. However, we think that such fales were illegally upon Fusi without the permission of the Governor, as required by Sec. 1291 of the Code of 1949, which is in substance a codification of Ordinance No. 15 and Regulation No. 16 promulgated by Commander Tilley in 1900.

 But the fact that the fales were there illegally in violation of Sec. 1291 does not necessarily mean that they were not the property of the people who built them. Samoan fales are movable and some of them are taken down and moved. If Mageo or one of the objectors illegally built his fale on Fusi after Fusi became the property of the Government, it was still the builder's fale even though it was on land of the Government in violation of Regulation No. 16 and even though the builder could have been evicted by order of the Commandant at any time. If the fale was destroyed by the Marines, the builder would have a war damage claim. And the recognition of a war damage claim by the War Damage Claims Commission would only be a recognition that the builder owned a fale, not that he owned the land on which it was built. If while in the prosecution of his military duty a U.S. Marine had accidentally shot Mageo's pig while it was illegally running at large in Fuga's plantation on Fuga land, the War Damage Claims

Commission would doubtless have recommended payment to Mageo for the pig, but that would not mean that the War Damage Claims Commission would have considered that Fuga's plantation and the land on which it was when the Marine accidentally shot it became Mageo land the moment his pig unlawfully entered Fuga's plantation and began tearing up Fuga's taro.

 And if the Attorney General or Commandant of the U.S. Naval Station should have intimated in a letter to Mageo or Taito or some other claimant that the United States or the Government of American Samoa might consider paying rent for the land in Fusi where Warehouse #7 stood, which land belonged to the Government of American Samoa, that would not transfer the title to the land from GAS to Mageo or some other claimant, as the case might be. The fact that Governor Coleman advised Mageo not to build his guest fale on Fusi is evidence that the Governor considered that Fusi was the property of the Government of American Samoa.

Since we are certain that Fusi as shown on the survey accompanying Mageo's application to register the same as the communal family land of his family is neither his communal family land nor the communal family land of any of the objectors, it follows that we must deny his application.

 While we are holding that all of Fusi as shown on the survey not including the filled-in part is the property of the Government of American Samoa, we cannot order Fusi, excluding the filled-in part, to be registered as land of the Government of American Samoa since there was no evidence to identify the boundary between the filled-in part and the remainder of Fusi by metes and bounds. Such boundary was not identified by metes and bounds. Tit. 10, Code of Am. Samoa, 1961 Ed. § 10.0112 obviously requires

that *all* the boundaries of land be identified by metes and bounds before it may be registered.

## DECREE

Accordingly, it is ORDERED, ADJUDGED AND DECREED that neither the applicant nor the objectors, nor any of them, are the owners of that part of Fusi seaward of the main East-West highway in the Village of Pago Pago. And it is further ORDERED, ADJUDGED, AND DECREED that Fusi excluding the filled-in part thereof is the property of the Government of American Samoa and that the filled-in part of Fusi is the property of the United States.

And it is hereby ORDERED that the application of Mageo to register the land Fusi (as shown on the survey accompanying his application to register) as the communal family land of the Mageo Family of Pago Pago be and the same is hereby denied. The Registrar of Titles will be informed of this denial.

Costs in the sum of $61.00 are hereby assessed against Mageo, Lago, Fuga, and Pogai and Faafia. Mageo, Lago and Fuga are each to pay $15.25 of the costs and Pogai and Faafia together are to pay $15.25. All costs are to be paid within 30 days.